IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARCIA HANLON,

                    Plaintiff,

      v.

PRINCIPAL LIFE INSURANCE
COMPANY,[1]

                  Defendant.

OPINION AND ORDER

08-cv-620-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       This is a civil action brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461.  Plaintiff Marcia Hanlon contends that defendant Principal Life Insurance Company violated ERISA by terminating her long term disability benefits under her employer's welfare benefit plan.  Jurisdiction is present.  28 U.S.C. § 1331.

       The case is before the court on the parties' cross motions for summary judgment.  Dkts. ##14 and 17.  The parties agree that defendant has discretionary authority to

---

[1] Plaintiff named Principal Financial Group, d/b/a Principal Life Insurance Company as defendant. Defendant has advised the court that its correct name is Principal Life Insurance Company.

determine the validity of an employee's claim for benefits under her employer's welfare benefit plan, leaving the sole disputed issue whether defendant's decision to terminate plaintiff's benefits was arbitrary and capricious in light of the relevant medical evidence. I conclude that it was not. Defendant based its decision to terminate plaintiff's benefits on an independent medical evaluation by an occupational medicine specialist, two evaluations by her treating physician, an in-home observation of plaintiff by defendant's agents and a functional capacity evaluation. It was reasonable for defendant to conclude from these sources that plaintiff could work full-time with certain lifting, sitting and movement restrictions. Plaintiff has not introduced evidence sufficient to permit a finding that she cannot work full-time with the restrictions defendant assigned her. Because she has not met her burden of showing that defendant's decision was arbitrary and capricious, her motion for summary judgment will be denied and defendant's will be granted.

From the parties' proposed findings of fact and the administrative record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

### A. Parties

Plaintiff Marcia Hanlon is a participant in her former employer American TV & Appliance of Madison Inc.'s employee benefits plan. The plan's long term disability benefits

are underwritten and insured by defendant Principal Life under the terms of Group Long

Term Disability Insurance Policy No. N74134.

Defendant Principal Life is an insurance company incorporated under the laws of the

state of Iowa, with its principal place of business in Des Moines, Iowa. Defendant is licensed

to do business in Wisconsin.

B. <u>Defendant's Insurance Policy</u>

Defendant is the claims administrator for the American TV employee benefit plan.

Under the terms of the plan, defendant has discretionary authority to construe and interpret

the terms of the policy, determine eligibility for benefits and determine the type and extent

of benefits to be provided, if any. Defendant's long term disability policy contains the

following definition of total and residual disability:

Part I - DEFINITIONS

Total Disability; Totally Disabled

A Member who is not working for wage or profit and solely and directly
because of sickness or injury:

a. during the Elimination Period and the three year period immediately
following the Elimination Period, is unable to perform the majority of the
material duties of his or her normal occupation; and

b. after completing the Elimination Period and the three year period immediately
following the Elimination period, is unable to perform the majority of the material duties of

3

any occupation for which he or she is or may reasonably become qualified based on education, training or experience.

      Residual Disability, Residually Disabled

      A Member who is working on a limited or part-time basis and solely and directly because of sickness or injury:

      a. during the Elimination Period and the three year period immediately following the Elimination Period :

      (1) is unable to perform the majority of the material duties of his or her normal occupation; and

      (2) is unable to earn more than 80% of his or her Indexed Predisability Earnings; and

      b. after completing the Elimination Period and the three year period immediately following the Elimination Period:

      (1) is unable to perform the majority of the material duties of any occupation for which he or she is or may reasonably become qualified based on education, training or experience; and

      (2) is unable to earn more than 80% of his or her Indexed Predisability Earnings.

Administrative Record (AR), dkt. #21-2, at 10-12.

      Plaintiff's  indexed predisability income was $6,179.28 per month.  (80% of her indexed predisability income is $59,321.01 for the year.)

      Under the policy, the employee bears the burden of proving her disability in order to claim long term disability benefits:

> Written proof that Disability exists and has been continuous must be sent to [defendant] within 90 days after the date a Member completes an Elimination Period.   Further proof that Disability has not ended must be sent when requested by [defendant].  [Defendant] may request additional information to substantiate loss or require a signed unaltered authorization to obtain that information from the provider. Failure to comply with [defendant's] request could result in declination  of the claim.

AR, dkt.#21-2, at 39.

### C.   Plaintiff's Medical History

In March and April of 2003, plaintiff visited  Dr. Patrick Spiering and Dr. Victoria M. Yorke, complaining of tenderness and pain in her right foot.  On April 18, 2003, after examining plaintiff, Dr. Kurt Oelke reported to Spiering and Yorke that it was likely that plaintiff suffered from reactive arthritis.  On September 28, 2003, plaintiff left her job with America TV because of her foot pain.  AR, dkt. #21-7, 841. She completed a claim form dated October 7, 2003, which defendant received on November 12, 2003.  On November 10, 2003, Dr. Yorke submitted a disability claim form to defendant documenting plaintiff's diagnosis of severe arthritis in the right foot, weekly doctor visits and treatment with antibiotics.  AR, dkt. #21-7, at 837.

On January 13 and 16, 2004, defendant requested medical records from July 1, 2001 to January 2004 and answers to medical limitations questionnaires from plaintiff's treating physician, internist and rheumatologist Dr. Lawrence Ryan, from Dr. Yorke and from

5

podiatrist Dr. Chad DeNamur. On January 27, 2004, plaintiff returned to work part-time. On March 25, 2004, defendant approved plaintiff's claim for long term disability benefits. It paid full benefits until the day plaintiff returned to work part-time and partial benefits from that point forward.

On September 30, 2004, Dr. Ryan examined plaintiff and prescribed methotrexate for her foot pain but wrote that further treatment would "have to go a little bit slow with her because of her marked anxiety about medications." AR, dkt. #21-6, at 676.  On November 18, 2004, Dr. Ryan's examination revealed substantial decrease of swelling in plaintiff's toes and certain joints of the right foot as well as no active synovitis anywhere.  Id.

On March 18, 2005, plaintiff reported to Dr. Jill Costello at the Medical College of Wisconsin that she had been feeling "much better" as a result of taking colchicine prescribed to her by a holistic doctor.  AR, dkt. #21-6, at 671-72. Plaintiff indicated her desire to discontinue the methotrexate.

After seeing plaintiff on May 5, 2005, Dr. Ryan observed the following:

[Plaintiff] reports much less pain and swelling in her foot.  She feels that her hips are much less stiff than previously, are virtually pain free and have improved their mobility.  She is seeing a holistic practitioner and chiropractor.

* * *

We spent some time discussing her physical capabilities. Now that she is feeling better I think that she could try going back to work in her former occupation. I would suggest that she start with three to four hours maximum three days a week with interspaced days off, possibly working Monday,

6

Wednesday, and Friday.  I have also suggested that she not sit for longer than one hour at a time since she has prolonged gelling after sitting for this duration.

AR, dkt. #21-5 at 658.

On May 26, 2005, plaintiff returned to work part-time at American TV, working four hours a day on Thursday and Saturday of each week.  On August 16, 2005, plaintiff started working for Shorewest Realty in Brookfield, Wisconsin, selling homes.  Plaintiff's hours fluctuated but she always took off two days a week.

On February 7, 2006, Amanda Karnas conducted a functional capacity evaluation of plaintiff.  Defendant scheduled the examination, seeking observation of plaintiff's sitting and standing posture. Karnas found that plaintiff was capable of sustaining a medium level of work for an 8-hour day and did not self-limit during her evaluation.  Plaintiff demonstrated adequate balance on level and uneven surfaces and was able to lift, carry, push and pull up to 28 lbs.  AR, dkt. #21-9, at 1159-64.

Defendant forwarded the functional capacity examination to Dr. Bhupendra Gupta, an independent occupational medicine specialist, who reviewed the examination.   On February 23, 2006, Dr. Gupta concluded in a report that plaintiff was "capable of moderate level duty work full time" and that "there is no objective evidence of a functional impairment to support that [plaintiff] is not able to . . . work eight hours per day."  AR, dkt. #21-9 at 1153.  Dr. Gupta provided the following medically acceptable restrictions and limitations:

7

- [Plaintiff] can occasionally (one-33% of total time, up to two and one half hours) work bent over standing/stooping.

- [Plaintiff] can lift floor to waist 20 pounds, carry with two hands to 30 feet 28 pounds, push 28 pounds, pull 28 pounds.

- [Plaintiff] can frequently (34-66% of total time, up to two and a half to five and one half hours) sit, stand, work arms over head standing, walk, climb, regular stairs, repetitive squatting, stoop, work kneeling, crawl, repetitive task rotation sitting, repetitive trunk rotation sitting standing.

- [Plaintiff] can adequately balance on level surfaces, balance on uneven surfaces.

- [Plaintiff] can inadequately balance on beam/scaffold.

Id. Gupta noted that plaintiff was no longer taking methotrexate as prescribed by Dr. Ryan.

Id.

On May 23, 2006, defendant advised plaintiff that the policy's definition of total and residual disability had changed and therefore, it would need to determine plaintiff's continued eligibility as of December 30, 2006 by obtaining and reviewing updated information regarding plaintiff's treatment, symptoms and resulting restrictions and limitations.  AR, dkt. #21-5, at 471-74.  (The parties have not identified the changes in defendant's definition of disability.) On November 15, 2006, defendant conducted a review of plaintiff's file and determined that plaintiff was not disabled.  On November 16, 2006, relying on the functional capacity examination conducted in January and an employability analysis and labor market survey conducted in July 2006, defendant recommended denial

8

of plaintiff's disability benefits beyond December 30, 2006.  Plaintiff was informed of the

termination of her benefits on November 29, 2006.  AR, dkt. #21-4, at 424-29.

On December 20, 2006, plaintiff requested reconsideration of the termination

decision.  AR, dkt. #21-9, at 1134-39.  In her December 20, 2006 appeal letter, she stated,

"I do agree that I can work Real Estate but only now part time and certainly not 8 hrs a day

+ 40 hrs a week. That is impossible." Id. at 1134.

In response to the appeal, defendant arranged an independent medical examination

by a specialist in occupational medicine.  On May 1, 2007, Dr. Al Baltrusaitis reported that

> [Plaintiff] ambulated with a forward gait favoring her left foot.  Her Romberg
> test was normal.  She was unable to do a heel and toe walk.  She was uanble
> to do a squat.  She was unable to do a forward bend more than approximately
> 45 degrees due to complaints of back pain.
>
> * * *
>
> [Plaintiff] has a diagnosis of progressive reactive arthritis. . . . She was very
> appropriately and adequately treated by Dr. Lawrence Ryan with methotrexate
> in 2005.  She had significant improvement and was functionally doing quite
> well when she decided to discontinue taking the methotrexate in favor of
> alternative treatments . . . She was still doing reasonably well when she had
> her physical work performance evaluation in February 2006.  That evaluation
> documented that she could do medium work over an 8 hour day. . . . [T]he
> reactive arthritis progressed and flared up by the end of that year.  At this
> point in time, she has once again significant problems now spreading to her
> left foot.   Her functional status is much more limited now compared to
> February 2006.  Her disease has progressed as feared and predicted by Dr.
> Costello who on March 18, 2005 advised her that the time to treat the
> arthritis was now before further damage occurs. . . . [Plaintiff] has once again
> sought treatment with Dr. Ryan and hopefully her current exacerbation can
> be stabilized.  However, based on her past history, my concerns are such that

9

once, or if, she improves she will again discontinue the more appropriate
traditional medical treatments in favor of the various nontraditional
practitioners she has been seeing in the past.

* * *

[Plaintiff] is currently doing somewhat better since she started treatment with
Dr. Ryan once again.  Her current functional status is much more sedentary
than originally noted in the physical work performance evaluation done in
February 2006.  Her functional level is much more in a light duty capacity
with lifting and carrying limitations of 10 pounds.  She has both sitting and
standing intolerances.  She would have to have a job where she could alternate
sitting and standing at least every 1-2 hours.  This is changing because she has
just recently started appropriate treatment.  The hope is that there would be
improvement.  Once she has reached a plateau of healing, then another
physical work performance may be appropriate.

AR, dkt. #21-8, at 1038, 1044-45.  It was Dr. Baltrusaitis's opinion that plaintiff was

capable of working an 8-hour day and 40-hour work week in a light duty capacity with lifting

and carrying restrictions of 10 pounds and the ability to alternate sitting and standing at

least every 1-2 hours.  AR, dkt. #21-8, at 1057.

On June 15, 2007, defendant referred plaintiff's file for an updated employability

assessment.  Taking into consideration Dr. Baltrusaitis's restrictions and limitations and

considering plaintiff's transferable skills, Charles Galaraga identified three occupations

plaintiff was qualified to perform: (1) real-estate agent; (2) supervisor, order taker, and (3)

sales representative.  AR, dkt. #21-8, at 977-991. Galarraga noted that plaintiff was not

"necessarily limited" to these occupations.  Id. at 978.  None of the positions required lifting

10

more than 10 pounds.  Id. at 977-991.

On October 3, 2007, defendant informed plaintiff that it was upholding its determination to terminate long term disability benefits.  AR, dkt. #21-8, at 969.  However, defendant extended benefits retroactively through May 1, 2007 because plaintiff had experienced a flare up in her condition at the end of 2006 and the limitations underlying the employability assessment were based on plaintiff's improved condition as of May 1, 2007. Id. at 979.

On January 24, 2008, plaintiff submitted additional medical records from Drs. Baggio and Ryan for further reconsideration of defendant's decision to terminate benefits.  AR, dkt. #21-8, at 928.  On January 24, 2007, Baggio wrote defendant, stating that he had concluded that plaintiff was able to perform 15-25 hours of work a week as a real estate agent.  Id. at 931.  On February 1, 2007,  Ryan began treating plaintiff's flare up and determined that it was too early to make a decision regarding her ability to work.  Id.  On July 16, 2007, Ryan indicated that plaintiff had no joint pain at all and no current joint swelling and that her probable reactive arthritis was "pretty well controlled."  Id. at 931.  On November 19, 2007, he noted that plaintiff complained of pain in her feet and shoulder but that her reactive arthritis was "clinically stable."  Id. at 938, 940.

On March 3, 2008, defendant's employees, Rene Haigh, a vocational consultant, and Beatrice Thompson, a claim analyst, met with plaintiff at her home to discuss her condition,

11

symptoms and restrictions and limitations.  Id. at 918-27.  Haigh and Thompson observed that plaintiff demonstrated fluid movements on numerous occasions and that despite the deformities of her feet, she did not wear orthotics or special shoes because they hurt her feet even more.  AR, dkt. #21-7, at 907.  Plaintiff told Haigh and Thompson that she had difficulty walking down stairs, id. at 901, that her husband did the vacuuming and washed the floors and that she could not shovel the snow.  Id.  Plaintiff stated that she worked as a real estate agent for 4 hours a day, every other day.  She answered phones at the office, provided information to potential customers, faxed documents, showed homes and researched listings.  Id. at 902, 905. Plaintiff stated that if she worked more than 15 hours a week she would have a problem medically.  Id. at 904.

In correspondence dated March 20, 2008, defendant upheld its initial determination to approve benefits through May 1, 2007 and decline further benefits beyond May 1, 2007. Id. at 893-97.


OPINION

Because the parties agree that the standard of review in this case is whether defendant's denial of benefits was an arbitrary and capricious application of the plan, Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989) (plan that gives defendant discretionary authority to construe claim terms is reviewed under arbitrary and

12

capricious standard), I will consider only the evidence and facts that were in the administrative record and before defendant when it made its decision. <u>Militello v. Central States, Southeast & Southwest Areas Pension Fund</u>, 360 F.3d 681, 686 (7th Cir. 2004); <u>see also</u> <u>Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan</u>, 195 F.3d 975, 981- 82 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record."). <u>Compare</u> <u>Casey v. Uddeholm Corp.</u>, 21 F.3d 1094, 1098 & n.4 (7th Cir. 1994) (when undertaking de novo review, court need not limit evidence to record before plan administrator).

The court will not substitute its own decision for the administrator's but will uphold the administrator's decision "if '(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem.'" <u>Militello</u>, 360 F.3d at 686 (quoting <u>Hess v. Hartford Life & Accident Insurance Co.</u>, 274 F.3d 456, 461-62 (7th Cir. 2001)). In other words, an administrator's decision will be overturned only if it is downright unreasonable. <u>Carr v. Gates Health Care Plan</u>, 195 F.3d 292, 294 (7th Cir. 1999).

Defendant terminated plaintiff's long term disability benefits, effective May 1, 2007, in reliance on the following evidence: (1) Dr. Batrusaitis's conclusion after examining

13

plaintiff that she could work eight hours a day and 40 hours a week with certain restrictions and that her condition was improving; (2) a July 16, 2007 and November 19, 2007 determination by Dr. Ryan that plaintiff's reactive arthritis was under control; (3) a June 15, 2007 employability assessment by Charles Galaraga, identifying three jobs plaintiff was qualified to perform in light of Dr. Baltrusaitis's examination; (4) a March 2008 in-home assessment by defendant's agents that plaintiff moved without difficulty and (5) a February 7, 2006 functional capacity evaluation by Amanda Karnas, indicating that plaintiff was capable of sustaining a medium level of work for an eight-hour day.

Plaintiff challenges defendant's determination as factually inaccurate and arbitrary and capricious because (1) the May 1, 2007 evaluation by Dr. Baltrusaitis demonstrated that she could not work full-time; (2) the functional capacity evaluation lacked foundation and was irrelevant because plaintiff's condition worsened; (3) defendant disregarded plaintiff's March 3, 2008 testimony about the difficulty she would have working a forty-hour week; and (4) defendant incorrectly identified certain jobs that paid below the minimum indexed predisability requirement.  In addition, plaintiff argues that defendant's role as the claims administrator is a conflict of interest and should count as a factor against it.

As an initial matter, the parties spend a great deal of time arguing whether plaintiff's decision to forgo traditional medical treatment in favor of holistic and integrative medicines was a reasonable treatment decision, without showing how this issue is relevant to

14

defendant's decision to terminate plaintiff's disability benefits.  Perhaps plaintiff meant to argue that defendant was discriminating against her because of the non-traditional options she sought.  A more likely interpretation is that defendant believed that plaintiff's decision to seek alternative remedies was an indication that her alleged pain and disability were not as severe as she alleged.  Whatever the case, the issue is irrelevant.  The record shows that defendant made its termination on the basis of plaintiff's condition and not the medicines she was taking.

Under defendant's policy, the employee bears the burden of proving initial and ongoing disability.  AR, dkt. #22-1, at 39.  Accordingly, plaintiff must show that she has an ongoing disability if she is to sustain her claim for disability.  Tolle v. Carroll Touch, Inc., 23 F.3d 174, 179 (7th Cir. 1994) ("To recover benefits under § 502(a)(1)(B), the employee must establish that he or she 'has satisfied the conditions necessary for benefits under the plan'").

The policy contains two "disability" classifications:  total and residual disability.  To establish that she has a "total disability," plaintiff must show that  she is not working and "is unable to perform the majority of the material duties of . . . her normal occupation" before and after the elimination period.  (Neither party explains the relevance or importance of the term "elimination period."  I assume it is not applicable to the parties' dispute.)  To prove residual disability, plaintiff would have to show that she is working on a part-time or

15

limited basis, cannot perform a majority of the material duties of her occupation and is unable to earn more than 80% of her indexed predisability earnings. Plaintiff contends that her condition amounts to total disability as defined by the plan or, at the very least, residual disability.

Plaintiff's effort to show that she is totally disabled under the plan falls flat. The language of the plan is clear: total disability means "[a] Member who is not working for wage or profit and solely and directly because of sickness or injury." AR, dkt. #21-2 at 12. It is undisputed that plaintiff was working as a real estate agent on May 1, 2007, when defendant made the initial termination of benefits, and that she was still working in this capacity on March 3, 2008 when defendant's agents visited her home to determine her eligibility for benefits on appeal. Although the undisputed facts show that plaintiff was not working full-time, plaintiff has suggested no reason why her ability to work part-time should not bar her from claiming benefits as a totally disabled person. From the undisputed facts and the language of the policy, I find that it was not arbitrary and capricious for defendant to determine that plaintiff was not "totally disabled" as defined by its policy. That leaves plaintiff's claim regarding residual disability.

Plaintiff argues that Dr. Baltrusaitis's May 1, 2007 evaluation is evidence that she was medically restricted from working full-time. She cites the symptoms he identified, his recitation of her ongoing medical history and quotes selectively from his report. Plaintiff

16

argues that the following observations by Dr. Baltrusaitis prove that she was disabled: she had a great deal of difficulty transferring or ambulating; she was unable to do a squat or a heel or toe walk; a forward bend of more than 45 degrees; she had deformities in her feet, swelling in her left foot and pain with movement in both ankles. Although it is undisputed that plaintiff had pain in her feet and difficulty with certain exercises and sitting for an extended period, Baltrusaitis never found her incapable of working full or part-time. In fact, he stated in his report that "[s]he would have to have a job where she could alternate sitting and standing at least every 1-2 hours" and that she is "capable of working an 8-hour day and 40-hour work week" with certain restrictions. In other words, he found her capable of working either part-time or full-time despite her medical condition.

In addition, Dr. Baltrusaitis did not conclude that as of May 1, 2007, plaintiff's condition was so dire that she could not conduct a majority of the material duties of her occupation. If, as plaintiff suggests, the symptoms described by Batrusiatis indicate that she is disabled, she should have provided objective evidence that her symptoms prevented her from doing a substantial or material portion of her duties. Williams v. Aetna Life Ins. Co., 509 F.3d 317, 323-24 (7th Cir. 2007) (denial based on lack of evidence showing that claimant's symptoms prevented him from performing job not arbitrary and capricious). Otherwise, I must defer to the doctor's observation that the symptoms he described did not render her disabled. He found that she could work in a more sedentary job that involved

17

light duty work and did not require carrying objects weighing more than ten pounds.

Next, plaintiff cites Baltrusaitis's recitation of her history of reactive arthritis from March 31, 2003 through October, 2006 as well as Dr. Baggio's January 24, 2007 letter that plaintiff is limited to 15 to 25 hours of work a week as additional proof that she was precluded from full-time work. Plaintiff's past history has no bearing on defendant's decision. The relevant question is whether plaintiff continues to suffer from a disability that places a total or significant restriction on her ability to work full or part-time. Dr. Baltrusaitis concluded that as of May 1, 2007, plaintiff did not suffer from a condition that rendered her disabled under defendant's policy.

Last, although plaintiff cites various passages from Baltrusaitis's letter indicating that her condition had worsened or had the potential to do so, plaintiff cites the letter out of context. Baltrusaitis did state that plaintiff's condition was worse when he saw her than it was in February 2006 when she had her functional capacity evaluation, but he did not conclude that it had worsened to the point where she could not work. In addition, Baltrusaitis makes repeated references in his letter to plaintiff's need to treat her condition properly to insure that it did not worsen. This is not evidence of ongoing or continuing disability.

In addition, the undisputed facts show that on July 16 and November 19, 2007, Dr. Ryan, plaintiff's treating physician, found plaintiff's reactive arthritis to be under control and

18

clinically stable.  This is further support for Dr. Baltrusaitis's conclusions.

Plaintiff also contends that defendant's reliance on the 2006 functional capacity evaluation was not valid because it lacked proper foundation and was rendered moot by Baltrusaitis's May 1, 2007 examination.  Amanda Karnas conducted the evaluation and found that plaintiff was capable of sustaining a medium level of work for eight hours a day, did not self-limit during her evaluation and was able to lift, carry, push and pull up to 28 pounds.  With respect to the first point, lack of proper foundation, plaintiff cites one case, Pfluger v. U.S. Group Long-Term Disability Ins. Plan, 2007 WL 130193 (E.D. Wis. Jan. 16, 2007), but  no additional outside expert opinion.  Pfluger is readily distinguishable on two grounds.  First, in Pfluger, the administrator's decision was not reviewed under the arbitrary and capricious standard and therefore, was not entitled to the same deference as the decision in this case.  Id. at *9.  Second, and more important, Pfluger provided independent evidence from her psychiatrist that contradicted the findings of defendant's functional capacity evaluation.  Id. at *5-6, *14-15.  Plaintiff has cited no independent medical evidence that might call into question the validity of the functional capacity evaluation in her case.  She offers only her own criticism, which is insufficient.

Given the change in plaintiff's condition between the 2006 functional capacity evaluation and Dr. Baltrusaitis's examination on May 1, 2006, it is questionable whether the administrator should have placed as much weight on the evaluation as it did.  However, I

19

cannot say that its doing so make its decision clearly unreasonable.  Sisto v. Ameritech Sickness and Accident Disability Benefit Plan, 429 F.3d 698, 701 (7th Cir. 2005) ("Under [arbitrary and capricious] standard, 'questions of judgment are left to the [plan] administrator,' and '[i]t is not our function to decide whether we would reach the same conclusion' as the administrator. Since the application of the plan's text and the resulting denial of accident benefits are reasonable, we will not overturn that denial.") (internal citations omitted).  Certainly, if the evaluation had been defendant's sole basis for terminating her benefits, plaintiff would have a stronger case.  However, it was only one factor defendant used in considering whether to terminate benefits.  Further, the observations by Drs. Baltrusaitis and Ryan that plaintiff's recent arthritis was improving with treatment and Baltrusaitis's confirmation that plaintiff could work with certain restrictions indicate that the evaluation was not entirely invalid.

Continuing to challenge the functional capacity evaluation, plaintiff argues that once defendant had the results of Dr. Baltrusaitis's May 2007 examination, it "had a duty to accept plaintiff's [March 3, 2008]  account as the most recent and relevant information concerning her health condition, symptoms and treatment."  Plt.'s Resp. Br., dkt. #26, at 14.  First, as I have found, it was not unreasonable for defendant to rely on the February 2006 functional capacity evaluation.  Second, defendant has no "duty" to accept plaintiff's self-described symptoms, particularly in light of the report of its own agents, who observed

20

that plaintiff was moving without difficulty when they interviewed her on March 3, 2008. Ultimately, plaintiff bears the burden of adducing objective evidence that her condition affects her ability to work either full or part-time.  Williams, 509 F.3d at 323-24; see also Johnson v. Metropolitan Life Ins. Co., 437 F.3d 809, 813-14 (8th Cir. 2006).

Plaintiff argues that defendant acted improperly when it changed the requirements of its long term disability policy by identifying jobs that did not pay 80% of plaintiff's indexed predisability income.  Plaintiff is misreading defendant's disability policy.  Under that policy, a claimant is classified as having a residual disability only if she (1) is working on a limited or part-time basis solely because of sickness or injury; (2) is "unable to perform the majority of the material duties of any occupation for which [she was] or may reasonably become qualified based on education, training or experience"; *and* (3) is unable to earn 80% of her indexed predisability income.  Merely meeting the third requirement is insufficient. Plaintiff must also show that defendant acted unreasonably in concluding that she had not shown her inability to perform the majority of the material duties of any occupation for which she is qualified.  Because it is plaintiff's burden to show all three elements and she has not shown that she can meet the second requirement, it is a moot point whether the jobs identified by defendant would or would not have paid plaintiff 80% of her previous income.

Last, plaintiff argues that defendant's role as the claims administrator is a conflict of interest and should count as a factor against it.  Paintiff cites Metropolitan Life Insurance

21

Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008) in which the Supreme Court held that "a conflict should "be weighed as a 'factor in determining whether there is an abuse of discretion.'" Id. (citing Firestone, 489 U.S. at 115.) Although I agree that Metropolitan Life requires a court to consider a conflict of interest as a factor in certain circumstances, plaintiff fails to illustrate how the conflict of interest applies in this case. She merely repeats her earlier arguments that the decision was arbitrary and capricious in light of other evidence on the record. Defendant's conflict of interest would be a tiebreaker in plaintiff's favor if the evidence were in equipoise *and* good reasons existed to show that the decision by defendant was against the weight of the evidence. Id. at 2351 ("any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance"). The mere existence of a conflict of interest does not carry the day for a disappointed claimant, when a case is not a close one. In this case, the undisputed facts show that defendant's decision to terminate plaintiff's benefit was not unreasonable.

ORDER

IT IS ORDERED that plaintiff Marcia Hanlon's motion for summary judgment, dkt. #17, is DENIED and defendant Principal Life Insurance Company's motion for summary judgment, dkt. #14, is GRANTED. The clerk of court is directed to enter judgment in favor

22

of defendant and close this case.

Entered this 20th day of July, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

23